Good morning, Your Honor. Charles Brown on behalf of Appellant Jose Sanchez-Montes. Your Honor, it's my understanding that Appellants have 15 minutes jointly. I would like to utilize five minutes of the Court's time and reserve the remaining 10 minutes for the stop of Sanchez-Montes. Your Honor, at trial below, the identity of the speaker on the Angulo undercover tape was a crucial issue at trial. Therefore, the government had little or no evidence corroborating Angulo's testimony that the speaker on the tape was Jose Sanchez-Montes. So the introduction of Cynthia Vergara's testimony at trial was really a significant event at trial that affected the outcome of that case. Under Rule 901 with respect to the introduction of lay opinion testimony, minimal familiarity is the standard for the threshold requirement for the introduction of lay voice identification testimony. And it's the Appellant's argument that that standard was not met in this case. Although the Ninth Circuit cases addressing the issue of what is required under 901B-5 indicate that prior firsthand communication with the speaker is not a prerequisite to introduction of lay opinion testimony under 901B-5, the Ninth Circuit cases really do seem to imply that some level of familiarity is required or that some additional addition of reliability is required under 901B-5. Why isn't that reliability provided by the fact that there's no dispute that the detention center conversation that was recorded was the voice of your client? And while the lay witness could be impeached by the fact that the lay witness had never spoken directly with your client, that the jury actually heard the tapes and could compare for itself whether or not the voice was the same? Certainly not. There really was no dispute that the voice on the MDCA exemplar did belong to Jose Sanchez-Montes. But as the defense attorney argued below, that the introduction of lay opinion testimony, that that voice matched the speaker on the MDCA exemplar and was necessary. But wasn't the jury told that they had to decide that issue? Yes, Your Honor. So what you're really arguing is that the lay witness should not have been permitted to offer an opinion on an ultimate fact issue that the jury had to decide? That's correct, Your Honor. The problem is that the rules of evidence say that you can. That is correct, Your Honor. So where's the error here? Your Honor, I think the problem is that when this testimony was introduced, she'd only seen the MDCA tapes the morning of trial and perhaps five times the day before. But doesn't that go to the weight that the jury would either decide to accord or to reject in whether it believed her opinion testimony or not? I think to a certain extent it does go to weight. But as a threshold issue, prior to the district court allowing her to testify, there should be some other indicia of reliability. For example, in the Ninth Circuit cases of Scully and Thomas, the court found that there wasn't sufficient familiarity because there was a face-to-face interview with the speaker. Or on the tape itself, the speaker was referenced by name. Doesn't that go back to the question I asked you earlier? If there's no dispute as to the MDCA exemplar, that that is the voice of your client, isn't that the whole rationale for why the district court needs to satisfy itself that the expert has a sufficient familiarity with the voice of the defendant in order to make the comparison? Yes, Your Honor, although this witness was not presented as an expert witness. Well, I mean, 901 doesn't – you don't have to be an expert. It just says whether or not a witness can offer an opinion. That's correct. And I don't mean to suggest that one can be an expert on this. But your argument has to be that the district court erred in admitting this evidence because it was unreliable. And my question for you is how can that be unreliable if there was no dispute as to the voice on the MDC tape? Certainly, our argument is that it's unreliable because there's really no sufficient basis for the witness to issue an opinion that the speaker on the second tape maps the voice. Well, Mr. Brown, then as opposed to this case, give me a hypothetical where it would be, say, you know, barely reliable. What more is needed to make it reliable? Your Honor, it seems I think one factor that would make it reliable would be if the voice on the informant tape, the undercover tape, referenced the speaker by name. For example, if the informant spoke to and said, Jose, I need X amount of drugs. Yeah, but then you don't need the expert at all. This is a situation – I've not listened to the tape because we just got it, but I understand that the quality isn't all that terrific. Was it ever argued, is it any part of your argument that the jury would not really be able to make the comparison, absent having somebody come in and tip it for them by saying, well, I've listened to it, so even if you can't make out this equivalency here, I can. Your Honor, I – Given the quality of the tape, they wouldn't – it's not as if they have a clear-cut, you know, a clear-cut point of reference. Yes, Your Honor, and I think the court's example would be an example where the introduction of lay testimony would be helpful for the jury under Rule 701, that this witness was in a better position to hear and understand what was occurring on the undercover tape and to make a viable, credible comparison between those two, short of presenting expert testimony, but that the lay witness was in a better position than the jury to help the jury understand or compare the voices. But that was not the case here. The witness, Vergara, had less familiarity or as much familiarity with the voice on the exemplar as the jury could have had. Okay. So our argument is really threefold, Your Honor, that the threshold requirement under 901 was not met, that even if it was met under lay opinion testimony was not helpful to the jury, and under 403 it really was confusing and needed additional credibility to a very material issue at trial, that there's really no need to introduce testimony on this issue. This issue really was for the jury itself. Okay. Do you want to leave time for your colleague? Yes, Your Honor. Okay. Thank you. Thank you. Good morning, Your Honors. Elisa Solano-Peterson for Appellant Gustavo Sanchez-Montez. First of all, as an initial matter, I want to bring to the attention of the Court that I did file a motion to supplement the opening brief based on Blakely, and it was denied without prejudice while Fanfan Booker is pending. So that may the Court may want to take this question. We have that in mind. Thank you. You preserved the issue. And the – well, first of all, especially since Informant Angelou was known to be an unreliable paid government informant and his testimony was so crucial to the government's case, there should have been wide latitude given to his cross-examination. And instead, the district court impermissibly curtailed cross-examination in regards to Mr. Angelou's arrest convictions and deportations. What more did you want to get in that didn't come in through the testimony about all of his prior dealings that we're familiar with? What was kept out? What was especially kept out was that he had a history of repeatedly lying to law enforcement agencies. And apropos of the prior case where the government argued that the fact of the DUI would have been prejudicial and Judge Teshima suggested that, well, the court could have brought the testimony in without identifying the specific crime. That's what happened in this case. Isn't that the case? Well, in this case, the district court said there could be cross-examination as to whether the defendant had lied to government agencies. But that's quite different than lying specifically to law enforcement officials because right now he is in a law enforcement context, and he has this long history of lying to law enforcement officials. So that's where the prejudice really lies. And also I believe that the whole context should have been brought in in regards to that it was in the context of arrests, convictions, and deportations because context is important. Like the U.S. Supreme Court case in Alford, the court said that the context in which the lies occur is important. And in regards to the ---- But why doesn't this get back to the same question that I was asking counsel in the earlier case, 608B? I mean, what you're really asking for is to get into the details of the prior instances of misconduct. And doesn't that go directly to the discretion of the trial court to decide whether or not the probative value is outweighed by getting off on all these collateral issues about the circumstances surrounding all these prior arrests and deportations of the witness that you're trying to impeach? Well, it was in the discretion of the court, but it's a felon's position that the court ---- Isn't it a discretionary ruling, or are you arguing something different? Well, it was an abuse of discretion because considering how important the informant's testimony was, considering that he was unreliable, this information, you know, was very material. And it should be noted that the district court even disallowed a mention that he had lied to law enforcement officials. And in that case, there didn't have to be a reference to arrest convictions or deportations, but just a reference that he had lied to law enforcement officials. And in regards to his prior narcotics felony conviction, there was a lot of problems with that because, number one, there was no certified copy of a judgment in the case. It was not established that his prior narcotic conviction was even a felony. The pre-sentence report said it was treated as a misdemeanor. And also, most importantly, it was not established that the prior conviction actually was Gustavo Montez's prior conviction because ---- Didn't the court keep asking for written submissions to challenge that, and they were never presented? No, I don't believe so, not in terms of the prior felony conviction. The only thing that it was the burden of the government to show that there was prior felony convictions, and they did not give a certified copy of a judgment. They just had a computer printout of court proceedings in somebody else's name. But as Judge Fisher says, the reason all that wasn't brought forward was because the allegation was never challenged, right? Well ---- The way it's supposed to be under the statute. Well, but I believe there was good cause for that because the defendant did not even ---- wasn't even notified about the information. I believe ---- But even after he was notified, there was no challenge. Pardon? I mean, didn't Judge Timlin say time and time again, you know, when are you going to file this? Are you going to challenge it? And nothing was ever done? Well, you know, there was a language problem here. And basically, the defendant was not informed of the information until trial had begun. But even after that, even after that, there was no challenge, was there? Well, I believe that there was an objection later, a general objection later. Well, actually, I think in the beginning there was a general objection at the ---- by a different counsel. But it's true that there was no written response. There was an oral objection. There was no written response. But also, the defendant did not even receive his pre-sentence report, which said that it was ---- that the conviction was treated as a misdemeanor until ---- until sentencing. I mean, sentencing was continued because he hadn't been advised of the whole pre-sentence report. So, therefore, it's a felon's position that there was good cause for his failure to file a written response. What do we make of the fact that Judge Timlin required the government to prove it up? That he required ---- Didn't he ask them to make them prove it up? Well, the government tried. But the thing is that it was never really established that it was even ---- that the conviction was actually Gustavo Montez's conviction. Now, wait a second. We have a specific finding by Judge Timlin who recites by proof beyond a reasonable doubt that it was established. How can you make that argument in the face of that factual finding by the district judge at sentencing? Well, I believe that the record shows that it was very insufficient because the only proof that the conviction was Gustavo Montez's conviction was there was a photograph in the file. And Agent Bullock said that, yes, this is Gustavo Montez, but it was not established that he had any familiarity with ---- So your argument is that the evidence is not sufficient to support Judge Timlin's ruling. Right. Yes, that's right. All right. And the other issue is in regards to sentencing enhancement, and that would have to be plain error review. But I think the record is very clear that these sting operations were set up in a way to enhance sentencing because in the beginning, Jose Montez said he didn't even deal with meth. And then after the informant talked to the DEA agent, then he mentioned methamphetamine to Jose Montez, and Jose Montez said he didn't deal with it. But then, you know, after solicitation, then he said he would, you know, sell him an oz. And then it got to the point where they tried to sell Montez pseudoephedrine, which he refused to buy. And then finally, when it came to the five pounds, he couldn't even produce it. So I think the record is very clear that there was sentencing entrapment that occurred in this case. Okay. And I would like to reserve the rest of my time. And in regards to the issues already argued by co-defendants, I would just like to submit on that. We understand you adopt those two. Okay. Everyone? The Maine Police Court, Mark Childs on behalf of the United States. I'll address first the issue concerning voice identification. Essentially what the defendants would like to do with 901B-5 is rewrite it. 901B-5 specifically delineates the low threshold that's required for voice identification. And that specifically is virtually any familiarity with the alleged speaker's voice. And that's consistent with the cases of Jones and Scully and Convino Valencia that's been cited by the government. Specifically in Scully, an agent compared voices to a tape, to an exemplar. And then in Thomas, an agent spoke with the defendant over the phone three times. But how did this witness aid the jury when you submitted the known exemplar and the questioned tape and told the jury in instruction it's your job to decide whether or not that is the voice of the defendant or not? This particular witness was a Spanish speaker. That's how she was identified to the jury. And were the tapes in Spanish? And the tapes were in Spanish. And there were voice inflections with the Spanish language that perhaps an Anglo speaker could not pick up on. And that was the sole reason that the government put on this particular witness, as well as to corroborate the very much troubled confidential informant. Here, the record needs to be analyzed pretty sharply, because there's a contrast between what the defense says on all these issues, what the facts are, and what the government submits as what the record is. Here, the tape involved, the MDC jailhouse tape involving the defendant, Jose Montes, was stipulated that that contained his voice. Also, that tape was 22 minutes in length, 22 minutes of length of the defendant's voice that was listened to approximately a dozen times by the witness, Cynthia Vigueria, the Spanish speaker. Does it make any difference whether the voice in that is very hard to hear or not? She indicated that she actually was able to pick up voice inflections from Jose Montes' voice. So her equipment that she listened to on the tape may have aided her in her ability to listen to the MDC tape. She actually pointed out that the defendant's voice, Jose Montes, in the known tape exemplar was a low tone, not a very high pitch, and he mumbles. And she was able to pick up those same voice inflections on the recorded conversations that were the subject of the case. So here, I would submit that, in fact, we have better evidence for voice identification than Thomas and Scully, where there were only brief encounters between the agents and the defendants face-to-face, let alone here the witness had the opportunity of unlimited amount of listening to an exemplar of the defendant's voice on a tape, which is exactly what she was comparing the defendant's voice to. It was tape-to-tape, unlike some of the other cases that the defense has cited, where it's face-to-face versus over the phone or on a tape itself. Here's the question I have, and I apologize for not having had the chance to listen to the tape directly yet. But if the situation is such that the quality, and I've heard other tapes where this is the case, where the quality is really marginal on both ends, both the exemplar and the CI tape that's sought to be identified, does the lay expert, the lay witness, have any role in clarifying that for the jury? In other words, you say that given her special listening equipment, she had headphones and whatever else, does that not risk substituting her judgment for what the jury might be able to pick off that tape? Even putting that aside, in this particular case, the jury did listen to the tapes immediately after being interviewed. I know they did, but if it's sort of a mishmash and all you're getting is noise with two people speaking, and you, absent having this witness testify that would have thrown their hands up and says, I can't tell who that is, I know it's supposed to be him, but I can't get in my head the quality of that speech to be of any use to me when I listen to the other tape. Well, when these tapes were played in court, as a foundation for the witness, they were played essentially on a boom box in the courtroom, and that's the way they were played to the jury. So what the witness listened to and what jury listened to them for their own comparison were the same. I know, that's still begging the question. My question is, she had the advantage of audio accessories that maybe the jury didn't. Therefore, the jury might have been in doubt based on hearing the two tapes. Yes, we know this is Jose, but we can't pick up enough off that conversation, given the quality of the conversation's recording, to say that it's the same voice that appears on the shorter tapes of the conversation with the CI. And so then what the expert is doing is saying, don't worry about it, I've listened to it, I've got special headphones or whatever, and therefore you can take my word for it. In a review of the record, I don't know if that testimony came out. She wouldn't have said it that way, it would have been implicit that way. Well, I don't know if it would have even been implicit, because in this particular case, that would be fodder for cross-examination. And I don't think that was developed on cross-examination, and that would also be an argument for the weight of the evidence, to provide it. That was never even raised in this particular case. Also, the defense stipulated that was his voice. In fact, the exemplar tapes, as well as the tapes at issue, the undercover recorded conversations, were all played for the jury, and there's no indication that the jury had any problems listening to those tapes. And there was no argument made by the defense counsel at any point that, in fact, these tapes were such poor quality that they shouldn't be played or even introduced. In fact, there was a motion in limine hearing where the government withdrew certain tapes because of their poor quality. Now, as for the issue concerning, well, the next issue that should be addressed is the limits on the cross-examination. Here, we have a case, and I know the Court has heard a case involving limited cross-examination, and I would say that here, the Court did limit the amount of cross-examination concerning the convictions of the defendant. However, it didn't rise to the level of being a violation of the Confrontation Clause, because the jury was saturated with evidence concerning the lack of credibility of this particular confidential informant, as well as specific evidence. Specific acts of the confidential informant's lies about his aliases, his date of birth, and specific acts of untruthfulness and dishonesty. I mean, it reads like a dream list for cross-examination, and here are some of the highlights of the extensive and really just pounding cross-examination. Well, maybe the prosecutor's dream list, but I don't hear the defense making that concession. I think their list is longer than yours. Well, I don't – the cross-examination of this particular defendant concerning his motivation and bias and his past acts of dishonesty was lengthy. You had the defendant that he worked for money for $12,000 and he got for the DEA. His drug problems, his current and past drug problems came out during cross-examination, including the fact that he used drugs up to a week before his testimony, and he lied to the agent about using drugs during the investigation itself. But what they're arguing is that by taking the repeated deportation illegal entries out, essentially what happened is that it got sort of put into this generic statement of, yes, I've lied to government. No. No. No. That's – there wasn't a – that's – the government would dispute that factual characterization. Right. The defense was able to get into specific acts of this defendant lying specifically to government agents. I mean, there was a – What was the testimony? The testimony – I mean, starting in chronological order, in 1990, the testimony was that this particular confidential informant kept $4,000. No, I'm talking about the deportation thing. The – he was allowed to ask – the court said, oh, you can ask whether he's lied to government officials, right? That's correct. They were allowed to. What they're saying is – but that's not the same thing as saying, this is the context in which you lied to them. You did it repeatedly and you're basically a liar when it comes to these kinds of contexts, as opposed to sort of a generic statement. Well, I've lied, and, you know, the jury says, well, who hasn't lied to government officials? So what? Well, no, I think that they were able to say specifically, in certain instances, this particular confidential informant lied to DEA agents. He lied during the course of the – and these were the arguments made at closing and also what was the – the confidential informant was cross-examined on, that this defendant had lied and used aliases to DEA agents and also government agents. As recently as – or as late as 1990, although he was right. You say lied and used aliases. Was that the lie, or he lied and he also used aliases? He lied, and the defense was able to elicit from the confidential informant that he lied in specific instances about his drug use, about his aliases, about his date of birth, about the fact that he kept $4,000 in a reverse buy back in 1990. I'm not familiar with that. That he said that he lied about his drug use during the investigation. He did not tell the DEA he bought methamphetamine from the defendant, Jose Montes, for his own personal use during the investigation. And he admitted he was not honest with the DEA about his drug use and his possession of illegal drugs. He also specifically stated that he lied to local, State, and Federal agencies, including the DEA agents, about his name and his date of birth. There was a long, laundry list. So your argument is all that they would have gotten in, in addition to that, was the context, and the context was not particularly accurate. That's correct, because this defendant's alien status was pounded into the jury. The jury was able to hear from the defendant, or from the confidential informant, that he was in the United States illegally for 30 years. He wanted help from the DEA to stay in the country. He wanted the DEA's help to stay out of jail. The DEA recently contacted the INS twice on his behalf. In fact, the INS was actively attempting to get him a work permit and delay his deportation. So you don't think it would have been material to the jury to know that he hadn't been continuously in the United States. He kept making these repeated transgressions. I think it would be like bringing sand to the beach. I mean, I think that it would just be one little piece of sand. I'm not so sure when the amnesty proposals that are floating around in the public are that people who have been here a long time with continuous presence, and the law makes that distinction, it's not like taking sand to the beach to get somebody who's repeatedly and repetitiously violating the law. Well, his repeated violations of the law were a subject of cross-examination, as well as he was, in fact, I mean, the jury was appraised of specific instances of misconduct, and also his motivation that he wanted to please the DEA so he could stay in this country legally, and that tied directly into his INS problems. There wasn't any issue about amnesty or anything that was argued in front of the jury. No, we're not talking about that. I'm just saying you're saying, well, it's taking sand to the beach to omit the fact that he wasn't someone, this wasn't the kind of immigrant who's been here for 30 years illegally. This is somebody who has come and gone, come and gone, come and gone, and in each of those times lied. That's a different kind of person, even in the law, under the immigration law. So I wouldn't characterize it as just like taking sand to the beach. I do see the distinction, but I think there's other instances of his misconduct and his failure to be honest. He admitted that he failed to file tax returns, he only filed tax returns two times in 30 years, and he did not report the $12,000 that he received from the DEA, in this particular case and other cases that he worked for the DEA. You have less than two minutes. Would you just spend like a minute on this on the Gustavus prior conviction? Sure. The 851 in Hampton. Yes. Briefly, the government disputes the characterization. We briefed this with our case sites and our expert record sites specifically. The first, the whole issue about the felony conviction is really a moot issue. The defense stipulated at the 851 enhancement hearing at the time of sentencing that in fact the defendant's prior conviction was a felony. That was a stipulated fact. Judge Timlin asked the defense counsel whether or not that there's any argument whether this was a felony or a misdemeanor, and the defense stipulated that it was a felony. Now, the defense, the chronology is as follows, and we'll shed some light on how the defendant was appraised of the 851. During a January 9, 2003, in-camera conference, the judge actually talked to the defendant about that the government was going to file an information, and then on February that was on January 9, 2004, 2003, I'm sorry. And then on February 4, 2004, prior to the start of Fort Dyer, the defendant was arraigned on the information, and the defense counsel represented before the arraignment began that the defense counsel had gone over the information with the defendant, that the defense counsel made the defendant aware for several months of the information, and the defendant was aware of the implications of the information. And in fact, the court went to such lengths that they handed and made a copy of the information for the defendant, and that the court read the information verbatim to the defense, to the defendant, and the defendant acknowledged he understood that information. And then after the guilty verdict on February 19, 2004, the court advised the defendant about the procedural mechanism to attack the conviction, the prior conviction, i.e., you've got to file some written paperwork. And the court warned of the repercussions for not filing it, and the court warned the defendant that a failure to do so would result in a waiver unless good cause was shown. So the defendant essentially had from February 19 to May 2, when the hearing was held, to file some written paperwork opposing the conviction, and he failed to do so. There's no good cause. I mean, it's coming after the fact. Ask this court to undo what Judge Timlin found. Judge Timlin didn't even have to hold an evidentiary hearing, but he did. And we submitted in our executive record all the paperwork on that effect, including the defendant's guilty plea to the prior, which the government would submit, indicates that it was a felony, which was, you know, as we know, it was stipulated to. And finally, a long story short, to make sure that this was in fact the defendant who had this prior conviction, the government put on a witness who testified about his obtaining the fingerprint analysis between the prior conviction and the defendant, Gustavo Montes, and how those fingerprints matched. And then during the sentencing portion of the defendant, I'm sorry, of the sentencing portion, the defendant actually admitted that, yes, he was convicted of this prior, but he had some. Okay, I think you've done it. Thank you. Okay, we'll give two minutes to the other side to divide up. Thank you, Your Honor. If I could just touch briefly on the impact of the government's statements during closing argument with respect to the voice on the Angulo tape. And I think that that was really, in terms of Jose Sanchez Montes, the key evidence in this case. When the government commented on that, made the statement that if Jose Sanchez Montes is not the speaker on the tape, then why don't they bring forth a family member to refute that claim? I think it really highlighted the crucial piece of evidence, and we think that was significant, Your Honor. But how is that a comment on the defendant's failure to testify? It may very well have been a really tough blow to his case, but that doesn't convert it into a constitutional violation. That's correct, Your Honor. The cases do make a distinction between comments directly towards the defense and general comments towards the defense witnesses, I should say. But in this case, the test is whether the jury can necessarily or naturally infer that the general statement can be refined to the more specific comment on the defendant's failure to testify. And we think that that was the case in this case. In fact, Judge Timlin, I think, noted his concern at the sidebar, and that's found at the second volume of the excerpt of the record on page 322. Judge Timlin noted the concern that although it was a general comment, given the importance of the evidence, the significance of the evidence, that it could be speculated by the jury that it was specifically targeting the defendant's failure to testify. And just, Highland, with respect to the – there was no curative instruction provided by Judge Timlin when the comment was made. Judge Timlin ordered the comment stricken from the record, but he did not provide a curative instruction clarifying the government's burden of defense. And I think that that's a significant thing we would have to work with. Although the government came back and said it was their burden. That's correct, Your Honor. Okay. That's correct. All right. We have the point, I think, in your jury. Thank you. You can have the mic. I would like to emphasize, Your Honors, that when the informant was questioned, he was not questioned about his specific lying to law enforcement agencies about his name. When he was questioned about his name, you know, it was basically whether he had lied to government agencies about his name. And, of course, everyone might have lied to government agencies. That's totally different. It's totally out of context. And also, it didn't bring out the 404B evidence because the fact that he had all these problems would go to his motive. And that couldn't come out with just a generic have you lied to government agencies. And in regards to his prior convictions, of course, the defendant did not bring up ineffective assistance because I don't think that's necessary in direct appeal. However, it should be noted that the pre-sentence report said that his conviction may not have been a felony, and yet that was being read to him during sentencing. So there really was good cause. He didn't know what was going on. He had English problems, and they were reading him the pre-sentence report at sentencing. And that's how this occurred. Thank you very much, Your Honor. Thank you very much. We thank counsel for your arguments, and we'll submit the case disargued, and we'll stand in adjournment for the day.
judges: Tashima, Fisher, Tallman